UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Criminal Action No. 6:17-CR-036-CHB |
| | ) |
| v. | ) |
| | ) **ORDER DENYING MOTION TO SET** |
| RODNEY SCOTT PHELPS, | ) **ASIDE VERDICT AND TO SET A** |
| | ) **NEW TRIAL** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Defendant Rodney Scott Phelps's Motion to Set Aside Verdict and to Set a New Trial [R. 170]. For the reasons set forth below, the Court will deny the motion.

**I.     Background**

After a two-week jury trial, Phelps was convicted on thirteen counts of fraud and conspiracy to commit fraud. Count one of the Indictment charged Phelps with conspiracy to commit wire fraud under 18 U.S.C. § 1349. Counts two through thirteen charged Phelps with committing wire fraud under 18 U.S.C. § 1343 through three distinct investment fraud schemes. The schemes started in 2012 when Phelps and co-conspirator Jason Castenir[1] created Maverick Asset Management ("MAM") as a private equity firm. From 2012 until late 2014, Phelps and Castenir induced numerous investors to send their money to MAM, promising high yield, low risk returns. In reality, Phelps and Castenir were actually operating a Ponzi-like scheme through

---

[1] On August 18, 2017, in Criminal Action No. 6:17-CR-042-CHB, Jason Castenir plead guilty to conspiracy to commit wire fraud under 18 U.S.C. § 1349 (Count 1), commodities fraud under 7 U.S.C. §§ 6o(1) and 13(a)(2) (Count 2), and transactional money laundering under 18 U.S.C. § 1957 (Count 3) [R. 13; R. 14; R. 16]

MAM by funneling "fresh" investor money to earlier investors under the guise of legitimate profits and skimming money for their own use and benefit.

In the first scheme, Phelps and Castenir presented investors with an opportunity to obtain an oil concession from the government of Belize and boasted of Phelps's prior successful experience drilling for oil in Belize (counts two through eight).  A second scheme involved debenture offerings (unsecured debt instruments) with the promise of little (or no) risk and substantial profits (counts nine through twelve).  The third scheme involved the purchase of a casino in Tunica, Mississippi, with promises from Phelps that his vast family fortune would fund the multi-million dollar purchase (count thirteen).  The backdrop supporting each of the schemes was the claim that Phelps was an heir to the Morton Salt fortune and controlled his family's large trust (the "Phelps Family Trust").  Investors were told that Phelps had significant business and investment expertise, and that the Trust would "back" their investments.  Phelps and Castenir defrauded more than a dozen investors of millions of dollars.  As part of his plea agreement, Castenir cooperated and testified at trial concerning his and Phelps's criminal activities.

After the United States rested its case, and at the close of all the evidence, Defendant moved for acquittal under Fed. R. Crim. P. 29.  The Court denied the motion.  Phelps now moves the Court to set aside the verdict or for a new trial based on new allegations of illegal activity concerning Castenir.  The Court construes this as a motion for a new trial based on "newly discovered evidence" pursuant to Fed. R. Crim. P. 33(b)(1).

According to Phelps, "[t]he allegations are essentially that Jason Castenir continued, unknown to these parties, to conduct business that demonstrates illegal behavior after his execution of his plea agreement with the United States." [R. 170 p. 1]  As part of his Motion, Phelps attached correspondence from the prosecuting attorney along with a memo from the FBI

case agent advising that Castenir, unknown to the government and his FBI handlers, was using an alias in an alleged securities fraud conspiracy unrelated to this case and became a target of an FBI investigation in another district, all of which potentially violated the terms of his plea agreement and his conditions of release. [R. 170-2]  Upon receipt of this information, the United States provided it to defense counsel, who filed the current Motion.  The Motion makes clear that "the [new] information [about Castenir] was disclosed post-trial of matters clearly not within the knowledge of the United States during the trial of the case" and the defense "casts no aspersions as to the behavior of the United States Attorney." [*Id.* p. 2]

The United States responded in opposition to Defendant's Motion. [R. 182]  The government acknowledged that Castenir is currently under investigation in an unrelated case and that government agents and attorneys "have different and varied opinions regarding the nature of the alleged misconduct, and the seriousness thereof." [*Id.* p. 2]  Even assuming the new allegations constitute additional crimes, the United States argues the new evidence is merely cumulative and its introduction at trial would not have likely resulted in an acquittal.  [*Id.*]

As a preliminary matter, neither party requested an evidentiary hearing on the Motion.  But even had Defendant requested a hearing, Court finds that, in light of the information provided by the government concerning Castenir's new conduct, the vast impeachment material concerning Castenir available to and utilized by defense counsel at trial, and the substantial corroborating evidence supporting Castenir's trial testimony (and Phelps's guilt), a hearing is unnecessary.  The verdict was not of "questionable validity," and the new evidence would be of "minor significance" in light of the entire record.  *See United States v. Winborn*, No. 16-1038, 2016 WL 10749644, at *1 (6th Cir. Sept. 29, 2016) (citing *United States v. O'Dell*, 805 F.2d 637, 643 (6th Cir. 1986)) ("[W]here the newly discovered evidence is of minor significance [in

light of the entire record], an evidentiary hearing is necessary only where the verdict is 'already of questionable validity.'").

## II. Discussion

Rule 33 of the Federal Rules of Criminal Procedure provides that the court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[M]otions for a new trial based on newly-discovered evidence are disfavored and should be granted with caution." *United States v. Dupree*, 323 F.3d 480, 488 (6th Cir. 2003) (citation omitted). In making a motion for a new trial based on newly discovered evidence, the defendant must show that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal if the case were retried. *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982) (citations omitted). The decision to grant or to deny a motion for a new trial rests within the district court's sound discretion. *United States v. Braggs*, 23 F.3d 1047, 1050 (6th Cir. 1994) (citation omitted). "[T]he mere existence of impeaching evidence does not warrant a new trial." *United States v. Davis*, 15 F.3d 526, 532 (6th Cir. 1994).

Phelps argues that because Castenir "gave the most thorough and comprehensively damning evidence" against him, Phelps is entitled to a new trial so he can effectively cross-examine Castenir about these new allegations. [R. 170 p. 1] The United States does not take issue with the first two factors of the *Barlow* test (that the evidence was discovered only after trial and could not have been discovered earlier with due diligence). [R. 182 p. 2] The Court agrees Defendant has met the first two factors. However, the United States argues, and the Court agrees, that the new allegations against Castenir would be merely cumulative or impeaching evidence and would likely not produce an acquittal if the case were retried.

### A.     The New Allegations Are Merely Cumulative and Impeaching.

First, the new allegations against Castenir are merely cumulative of evidence the jury already heard about Castenir during trial. Castenir testified that he perpetrated complex fraud schemes against numerous investors. He testified that he pled guilty to multiple felonies for those crimes and acknowledged that he sought leniency through cooperation with the prosecution. [R. 175 pp. 206-07, 244-45] Furthermore, the Court instructed the jury that it should scrutinize Castenir's testimony more than other witnesses and that it should not convict based on his uncorroborated testimony unless they believed it beyond a reasonable doubt. [R. 154 Instr. No. 23] Additional evidence of Castenir's alleged criminal activities—particularly in unrelated matters—would be relevant solely to impeach Castenir and is not material to the conduct which was the subject of Phelps's trial. For example, in *United States v. Braggs*, 23 F.3d 1047, 1050 (6th Cir. 1994), the defendant sought a new trial based on newly discovered evidence of two prior convictions undermining the credibility of a witness. However, because such evidence was sought merely for impeachment purposes (and was not material to the guilt or innocence of the defendant), a new trial was not warranted. *Id.* Not only had the witness been cross-examined at trial, but his testimony was also corroborated by other evidence introduced at trial. *Id.*

Similarly, in *United States. v. White*, 861 F.2d 994, 995 (6th Cir. 1988), the defendant sought a new trial based on "newly discovered evidence" relating to a co-defendant who testified against him at trial. White alleged that the government had made oral promises to this co-defendant (including a promise to handle an *unrelated* civil rights complaint on the co-defendant's behalf) in return for that witness's cooperation. *Id.* White argued that these alleged oral commitments directly affected the co-defendant's credibility as a witness, requiring

a new trial. *Id.* at 996.  The district court denied White's motion, reasoning that the allegations would not have affected the jury's judgment of the co-defendant's credibility, "considering all the impeaching evidence proffered at trial." *Id.* at 996, 998.  The Sixth Circuit agreed, finding that:

> [w]hen this impeachment evidence is evaluated in the context of the entire record, it is apparent that, had the jury been advised of [the witness's] subjective beliefs about the alleged government promises, it would not have in any way affected the jury's judgment of [his] credibility, or the outcome of the trial.

*Id.* at 998.  Because White failed to meet the third and fourth elements of the *Barlow* test, he was not entitled to a new trial. *Id. See also United States v. Lewis*, No. 90–3604, 1991 WL 43903929, at *6 (6th Cir. Mar. 29, 1991) (citations omitted) ("Evidence of a witness's [additional] illegal activity does not warrant granting a new trial where, as in the present case, the defense's credibility attack at trial included evidence of past illegal activity.").

So too here.  Phelps's counsel extensively cross-examined Castenir, during which Castenir admitted to a whole host of fraudulent activities including falsifying bank documents [R. 175 pp. 229-30] and investor financial reports [*id.* pp. 207-11], manufacturing fake profiles on MAM's website for Phelps and others [*id.* pp. 194-95], misrepresenting his investment experience [*id.* p. 236], and committing several other criminal acts in furtherance of the charged schemes.  He was crossed on his intentions to "lie, cheat [and] steal" [*id.* p. 192] and the fact that he used investor money for personal gain. [*Id.* pp. 213; 239-40]  He conceded that he and Phelps were "robbing Peter to pay Paul," [*id.* pp. 229-31] and that their actions were "clearly criminal," harming a lot of people. [*Id.* p. 231]  It was certainly not lost on the jury that Castenir was capable of additional criminal conduct.

Thus, even if Phelps had the opportunity to question Castenir about his "additional active criminal fraud behavior" (which occurred independently of the charged schemes) [R. 170 p. 2],

this would only constitute further impeachment material attacking Castenir's already suspect credibility. Phelps admits as much, asserting that he "would have vigorously cross-examined Mr. Castenir as to his motive and bias and continued fraudulent activities in the face of his seeming acceptance of the criminality of his behavior in this district and elsewhere." [*Id.* at p. 5] Such newly discovered impeachment evidence does not warrant a new trial. *See United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976) (concluding that a new trial was not warranted because the newly discovered evidence—allegations that the chief government witness attempted to bribe non-testifying individuals to corroborate his testimony—could be used only for impeachment purposes); *Braggs*, 23 F.3d at 1050; *Davis*, 15 F.3d at 532.

Further, as explained below, the jury did not have to rely on Castenir's word alone to find that Phelps was involved in the fraudulent schemes because vast amounts of corroborating evidence supported the verdict.

   **B.**  **The New Allegations Would Likely Not Produce an Acquittal.**

Second, the new allegations against Castenir would likely not produce an acquittal if the case were retried. *Barlow*, 693 F.2d at 966. Phelps argues that it was Castenir who "made the entire case fit together seamlessly; who plugged evidentiary holes in terms of actual misrepresentations, forgeries, directions to banks, [and] withdrawal requests . . ." [R. 170 p. 3] Although Castenir's testimony was certainly helpful to the government's case, substantial corroborating evidence was presented sufficient for the jury to find Phelps guilty of conspiring with Castenir and guilty of actual fraud.

In *United States v. Davis*, 15 F.3d 526, 529 (6th Cir. 1994), the defendant sought a new trial based on newly discovered evidence that one of his arresting detectives resigned amid allegations of planting drugs on a suspect in another, unrelated matter. *Id.* During the

defendant's trial, this detective testified that he observed the defendant discard a piece of cocaine at the time of his arrest. *Id.* In upholding the trial court's denial of defendant's request for a new trial, the *Davis* Court found that evidence of the detective's wrongdoing in the unrelated cases "was useful only for impeachment and was not material," noting the other corroborating evidence supporting the verdict. *Id.* at 531-32. Accordingly, the Sixth Circuit agreed that the detective's "alleged involvement in planting drugs *in unrelated cases* would not likely produce an acquittal in this case if it were retried." *Id.* at 532 (emphasis added). *See also Garner*, 529 F.2d at 969; *United States v. Rumler*, No. 91–1071, 1991 WL 203089, at *5 (6th Cir. Oct. 4, 1991) (concluding that evidence of witness's unfulfilled cooperation agreement would not likely produce an acquittal, given the "substantial" evidence supporting the defendant's guilt); *Lewis*, 1991 WL 43903929, at *5 (finding that, even if the alleged new evidence of witnesses' additional crimes and perjury had been introduced, the jury could still convict based on other witness testimony and documentary evidence incriminating the defendant).

Likewise here, evidence of Castenir's unrelated criminal conduct would not have produced an acquittal in light of the substantial evidence concerning the three schemes, which included compelling testimony from numerous investors who dealt directly with Phelps, emails and text messages between Phelps, Castenir and investors, phony marketing materials and the MAM website (replete with fabricated pictures and biographies), and copious bank records demonstrating that most of the investor funds were used for "lulling" payments to earlier investors, MAM operating expenses, and otherwise siphoned off by Phelps and Castenir. [R. 178 pp. 123-65; 208-22]

### 1.      The Belizean Oil Concession Scheme

Several investors testified at trial that Phelps convinced them to invest in an opportunity to obtain an oil concession from the government of Belize. These investors testified that Phelps and Castenir boasted of vast experience in successful oil exploration ventures and promised them a 23 percent return on their investment [R. 174 p. 51] plus royalties on any oil extracted. [*Id.*] MAM's website and other marketing materials contained representations about this claimed experience in the oil industry. One investor, Dion Garnett, testified that he spoke directly with Defendant who told Garnett that he was Trustee of the Phelps Family Trust with holdings over $200 million and ties to the Morton Salt fortune [*Id.* pp. 40, 132-133, 137-138]; that he managed the Trust in an offshore account [*id.* p. 46]; that he had connections to the Belizean government [*id.* p. 46]; and that the Phelps Family Trust would "back" Garnett's investment. [*Id.* pp. 46-47]. Garnett received an HSBC bank document (forwarded to him by Castenir) which stated that the Phelps Family Trust had a balance of $273 million. [*Id.* pp. 50, 93] An officer from HSBC testified that the bank record was fake. Phelps even told Garnett a story about the identity of the famed Morton Salt girl (the one holding an umbrella) who appears on all Morton Salt products. [*Id.* p. 90] Based on Defendant's representations, Garnett and his group of investors wired MAM over $500,000 to invest in the oil concession scheme, and they lost almost all of it. [*Id.* pp. 71-72, 81]

### 2.      The Debenture Scheme

The debenture scheme operated much like the oil concession scheme. Two investors, Kathy Dillaha and Becky Winemiller, explained that Phelps convinced them he was an heir to the Morton Salt fortune and that he had vast investment holdings and business experience. [R. 174 pp. 260-61, 264-65] Based on his personal success and assurances, they invested significant

sums with MAM to trade on various commodities markets. They testified that Phelps boasted of MAM's vast experience successfully trading on these markets, including with funds from the Phelps Family Trust. [R. 174 p. 265, 270-71] At one point, Winemiller was sent a bank statement reflecting the Phelps Family Trust had over $440 million in holdings. [*Id.* p. 264] They testified that Phelps convinced them that the Trust would "back" their investments and that only a small percentage of their investment (2%-5%) would be at risk at any one time. [R. 173 p. 45] Dillaha explained that she researched MAM and Phelps prior to investing and found the company's website to be professional, assuring her that her investment was in good hands. [*Id.* pp. 48-49, 59-60]

The United States presented evidence that MAM's website contained numerous misrepresentations, embellishments, and outright lies. Several of MAM's team of professionals pictured did not exist: their photographs and biographies were completely fabricated. Needless to say, Phelps and MAM never handled $2 billion in sales and cash flow as the website claimed (or even a fraction of that); Phelps and Castenir had little experience trading in the markets. [R. 173 pp. 59-60] They invested a portion of the investors' money in commodities markets (and lost almost all of it). To hide the losses and lull investors into sending more money, they created fake investment reports which they sent to investors reflecting gains on the accounts. Phelps was copied on numerous emails sent to investors by Castenir attaching the fraudulent reports. All totaled, Dillaha invested $200,000 [R. 174 pp. 61, 68-69; R. 178 p. 142], and Winemiller initially invested $250,000 and then another $750,000. [R. 174 p. 272, 279; R. 178 p. 129] They lost most of their investments. [R. 178]

### 3. The Casino Scheme

Mrs. Winemiller further testified that during this same time, Phelps convinced her and her husband to invest in a deal to purchase a casino in Tunica, Mississippi. [R. 174 p. 278; R. 178 p. 129] She testified that Phelps promised the Trust would match the Winemillers' $750,000 debenture investment with $750,000 from the Trust to go toward the casino purchase [R. 174 pp. 278-79, 286], and would finance the casino acquisition. [*Id.* p. 283] As the deal progressed, Phelps told the Winemillers that the sellers of the casino requested additional earnest money to hold the position. [*Id.* pp. 283-85] In February 2014, the Winemillers wired another $1,000,000 to hold the deal. [*Id.* p. 285] The casino purchase eventually fell through, and Phelps and Castenir failed to return the vast majority of the Winemillers' money. [R. 178 pp. 134-38, 147-65]

The United States traced the investor funds from the fraudulent schemes. FBI forensic accountant Troy McCracken testified that the funds were largely used to pay other investors, to pay MAM business expenses, and to enrich Phelps, his family members, and Castenir. [R. 178 pp. 123-65, 208-22] The prosecution also called employees of Community Trust Bank (where MAM and Phelps held their accounts), who testified that Defendant frequently conducted transactions in person at the bank, withdrawing cash and moving money between MAM accounts and other personal and business accounts related to Phelps and Castenir. To further demonstrate Phelps's involvement in the schemes, the government presented the testimony of Ken Smith who testified that in connection with leasing a house to Defendant outside of Nashville, Phelps provided him with a MAM bank account statement reflecting a bank balance of over $7,200,000; the document turned out to be fraudulent. [R. 178 p. 33]

Finally, Phelps testified. He denied ever defrauding anyone, denied telling any of the investors he was a wealthy heir, claimed the investors who testified were all lying, and claimed he had been framed and defrauded by Castenir, the real culprit. *See, e.g.*, [R. 180 pp. 131–34, 160, 181] Phelps testified that he, too, lost substantial sums due to Castenir's fraud (but failed to produce any evidence corroborating his loss). [*Id.* pp. 129–30] The jury's verdict makes clear they simply did not find Phelps credible.

In sum, there was ample evidence corroborating Castenir's testimony for the jury to find Phelps guilty beyond a reasonable doubt. When the new allegations concerning Castenir are evaluated in the context of the entire record, it is clear that had the jury been advised of the new evidence, it would not have affected the jury's judgment as to Castenir's credibility or the outcome of the trial. *White*, 861 F.2d at 998. Phelps has failed to meet the third and fourth prong of the *Barlow* test.

### III.     Conclusion

For the reasons stated above, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.     The Defendant's Motion to Set Aside Verdict and to Set a New Trial [**R. 170**] is **DENIED**.

This the 15th day of May, 2020.

*Claria Horn Boom*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY